I call the case number 19-2255, Bio-Rad Laboratories, Inc. v. 10X Genomics, Inc. Mr. Rosenkranz. Thank you, Your Honor. Good morning, and may it please the Court. I'd like to spend my time today on two issues. The first is the erroneous application of the doctrine of equivalence. To vitiate claim language and reclaim territory that the inventors surrendered to get the patent approved. The second is the need to correct an egregiously flawed damages award, a huge 15% royalty, that was not in any way apportioned, and that was partly based on a reference license that the district court found to be not comparable. Starting with the equivalence issue. To overcome prior art, the inventors of the 0A3 patent consciously narrowed their claim to require a microfluidic system with a non-fluorinated microchannel. The jury found that 10X's microchannels are fluorinated. Bio-Rad could not, therefore, invoke the doctrine of equivalence for two independent legal reasons. The first is vitiation. Simply put, an opposite cannot be an equivalent. Counsel, we have many recent cases explaining that vitiation is not just an independent concept, and the whole question is what exactly was the purpose of the amendment, and therefore, what is the defining scope of the amendment? Yes, Your Honor. Let me get you to those questions. First of all, I have a couple housekeeping questions. First, aren't there two years of sales before the Kynar was added? That is correct, Your Honor. So this particular issue relates only to the subsequent sales, and there's another 0A3 issue that are about all sales. Okay. And then I don't see any real dispute in the record as to whether the addition of the Kynar had any technological benefit or purpose. Is that right? Your Honor, there was a dispute in the record, but I would grant you that the jury was entitled to conclude that the two functioned the same, which, by the way, will be true in any doctrine of equivalence case. I know, but I think it went further than that, didn't it? I mean, your own witnesses said they knew of absolutely no benefit to adding it, right? Your Honor, I would quibble. Certainly the jury could have found that, but our own witnesses said that the Kynar chips behaved better, but they didn't isolate the benefit to the fluorination. But if the jury could have found it, doesn't that really answer the question? It does not, Your Honor. The jury can always find doctrine of equivalence in a case in which either vitiation or fraud... But you said they could have found, and it's really quite a hurdle to say that two hundredths of a percent was a significant difference, other than the context in which this material was added. Well, so, Your Honor, what I'm saying is this is a legal bar. Both vitiation and prosecution history estoppel, if they apply, prevent the question of equivalence from even getting to the jury. So to get to Judge O'Malley's question, yes, there are lots of cases that say you go to the purpose, but there are all of these cases that say that an opposite cannot be an equivalent. We cited five cases rejecting equivalence on that case. But how do you get past cadence where we specifically cautioned against basing the DOE inquiry on labels like antithesis or polar opposites? Well, Your Honor, we're not basing it on labels. What this court said was that certainly you cannot convert every doctrine of equivalence case into an on-off switch. Is the element present or is it not present? But when you have an antithesis, when you have a claim stated in binary terms, vitiation arises. And I would hasten to add, so in this case with estoppel, prosecution history estoppel arise, which independently compels the same result. Now the patentee chose to add non-fluorinated as a claim limitation to overcome prior art that was fluorinated. I mean, they had a choice as to how they would actually couch the language of the claim. Mr. Rosencrantz, what is the alternative or an alternative set of words that the applicant might have used to capture the notion that I think they were trying to capture or that you say they were trying to capture that there shouldn't be so much fluorine on the surface where the plug fluid might touch it as to cause a problem of stickiness? Well, Your Honor, I'm not saying that's what they were trying to achieve. Take that as an assumption for the purpose of the question. So I'll give you two. They could have drafted claims that said microchannels sufficiently non-fluorinated to achieve X or microchannels with less than X percent fluorine. What matters under this Court's cases is what the inventors actually said and did to overcome the prior art. But that's just not entirely true. The whole point of this somewhat mysterious but nevertheless precedential tangentiality exception to prosecution history estoppel is that there are some choices made by the applicant to narrow the claim that have a purpose to which the equivalent or, more precisely, the difference between the accused product and a literally infringing one is essentially tangential. So you can't just say they made the choice. It's always true that tangentiality is not giving full formal effect to the choice. I understood, Your Honor. So let me say two things. The first is that Pharmatech explains, and I'll quote, that the amendment may have ceded more claim scope than necessary to overcome the prior art does not matter. Quote, the fact that the inventors may have thought after the fact that they could have relied on other distinctions is irrelevant to discerning the objective reason for the amendment. The objective reason for the amendment was to overcome the prior art. Whether the microchannels, to Your Honor's question about tangentiality, whether the microchannels contained fluorine was not peripheral to the conversation. It was the conversation. The inventors told the examiner that Quake's reference to fluorinated channel walls, quote, does not matter. No, the whole point was that with Quake, the carrier fluid and the walls didn't have different chemical properties, and the whole point was to point out that what was being claimed were chemically distinct, so that you have to sort of look at the addition of the non-fluorinated microchannels in the context of adding at the same time the fluorinated surfactant to the carrier fluid, right? So, Your Honor, again, they had the choice to narrow their claims, and they made a strategic choice to go broader. I'm very conscious that I'm running out of time to address an equally important question of damages, so let me just close this portion by urging the Court to look at in situ form, which conveys a very clear example of what it means to be peripheral. When you're not even talking about the subject matter at hand that caused you to amend the claim, that's peripheral. But here, they were talking about fluorination. So, if I may turn to damages, a Bio-Rad expert cherry-picked the licenses with the three highest outlier rates in the record to gerrymander a rate that was 15 times the rate paid for instruments and the only license on the same patent. We've briefed multiple flaws in this analysis, but I'll mention two today. But one of them is not admissibility, right? Because I didn't see any discussion of Dawbert or admissibility issues. Your Honor, that goes to my second point. At a minimum, there needs to be a new trial because the District Court conceded that one out of three of the licenses was not comparable. We do raise a Dawbert challenge. We did raise it below. The analysis is exactly the same because the testimony was exactly the same. The expert did not narrow his testimony during a trial. He covered the same exact ground. And to be clear on the second point that I'm making, the admission of that particular license, once the Court found that the license was not comparable, that means the jury should not have heard about it. And under Third Circuit law, Bio-Rad has the burden of demonstrating that it is, quote, highly probable that the error did not affect the jury's verdict. Bio-Rad doesn't even say that it can meet that standard. Is that the standard? Isn't the standard straightforward, substantial evidence? No, Your Honor. We are not, for this portion, we are not making a substantial evidence argument. There were three licenses introduced. One of them, the jury should not have heard. Because the jury heard it, they couldn't use the verdict. I'm sorry, just to be clear, this is the Aplera Bio-Rad PCR instruments license? Yes, Your Honor, and there are multiple reasons why that is the introduction of that evidence that has affected the jury. First, Aplera was the only license out of the three that applied such a high rate to instruments. Second, it was the only license... No, continue. Sorry, Your Honor. No, continue, continue with the thought. And I'm hoping I can say just a few words on apportionment as well. Second, it was the only license with a straight to 2% rate. Third, Bio-Rad's expert led with the Aplera license when testifying about apportionment. And fourth, Bio-Rad emphasized all three in its summation. If I may, Your Honor, just a few sentences on apportionment. Okay. This court's cases could not be clearer that apportionment is required. And there's no dispute that the accused products reflect numerous innovations that Tenex contributed. You can see them on page 15 of our opening brief. Now, on appeal, Bio-Rad asserts that so long as the two technologies are essential to different products, they should be licensed at the same rate in both. You just can't do that. Laser Dynamics says that you can't do that. What Bio-Rad did here is like saying a long-life battery is important in a smartphone and Wi-Fi capability is important in a laptop. So the royalty rates have to be equivalent. The asserted patents tweak the chemistry of droplets. But Bio-Rad's reference licenses are for very different technologies, like how to magnify DNA for detection. Are you saying you were prevented from arguing to the jury as to how they should view this evidence? No, Your Honor. We could argue to the jury. What I'm saying is that the evidence was both inadmissible because the expert failed to apportion it all and that it was insufficient. The evidence Bio-Rad did provide to the jury was simply qualitative conclusory testimony. I urge the court to look at just two pages. I mean, it's really only two pages long. It's 30,074 to 75. Mr. Malachowski said little more than, trust me, I apportioned. He gave a formula. It's reproduced on page 66 of the blue brief. But he never filled in any of the blanks. He says he got inputs from the technical expert, Dr. Sia, who says, I didn't do apportionment or comparable apportionment at 29,606. He says he got confirmation from Ms. Tumalo. But Ms. Tumalo, this is a Bio-Rad executive, offered only the most superficial observations, like Bio-Rad did, quote, the heavy lifting, or, quote, I would say by far the value in my mind was the quanta life, or Rain Dance provided the big idea for the licensed product. That's exactly the sort of superficial testimony that this court condemned in Syro. Mr. Rosenberghouse, can I just ask you, what was your evidence on this particular question of the relative value of the patent-covered technology and the other components of the products? Well, Your Honor, we- I know they have the burden, but get beyond that. Yes, yes, yes. We presented an expert who took the most comparable license and got it, which would be 1% for instruments and 3% for consumables on the same exact patent, the only license on the same patent. And he said that when you apportion, you get down to about, you get down to three-eighths of 1% for instruments and three-quarters of 1%. And it's precisely-I'm sorry, for consumables. And it is precisely- And what kind of concrete components did that analysis have? Did he enumerate the other components and the risks involved and all so on? Yes, yes, Your Honor. And so on page 15 of our brief, you can see the list of other features that he evaluated. I mean, the patents in suit had nothing to do with this enormously valuable single-cell invention, which was the breakthrough of the year in 2018. And this list of five items, which was only the beginning of the list, shows all of the technological problems that ChemEx solved in order to create a device that doesn't simply do chemical reactions in droplets, which is what the patents in suit did, but actually takes the DNA from cells, isolates cells in particular droplets, and allows for analysis of particular genetic aspects of those cells one by one in the hundreds of thousands at a time. And so you simply cannot take a license that is about a completely different technology, which is PCR technology, for example, and apply it to this very different technology on the patent in suit. I think that there was some question as to whether it was completely different. I think, you know, let's not overstate. Well, Your Honor, again, I'll say the BioBrads reference licenses were for magnifying DNA for detection. That's what PCR does. And the product using the license technology in ours was about isolating cells in particular droplets. I mean, that is about as different as the licenses in laser dynamics where this court said, oh, come on, you can't just say it's about hard drives. Here you can't just say it's about genetics. I'm sorry, it's about droplets or genetics in droplets. These are very, very different functions. And again, what he did in his testimony was literally two pages worth on apportionment without any of the inputs, so two pages on 30,074 to 75, and then just four pages later, one sentence, and two pages later, one more sentence. Okay. Let's hear from the other side, and we'll save some rebuttal. Thank you, Your Honor. Thank you, Your Honor. Mr. Reines. Thank you, Your Honor. Good morning. My name is Ed Reines, and I know we're using a new system here, so please feel free to interrupt me at any point in time. I'm not being rude if I don't anticipate the interruption. First of all, I want to do a reset on, just because I know it can be helpful, that the 083 patent, the 193 patent, and the 407 patent all support the verdict. There is no argument that if any one patent falls, therefore, that the damage number or the royalty number doesn't take that into account. And the second argument that counsel didn't want to argue regarding the 083 patent is, we think it's an extremely meritless argument. So with respect to the 083 patent, as Judge O'Malley correctly observed, that would only relate to just a couple of years of sales more recently. Just to be clear, are you saying that even if we concluded that infringement on the 083 had to be reversed, that upholding the infringement on the pair of method patents, I guess, that that would independently support everything in the remedy? No. I guess the point being that there would still be infringement, then we have to go down for another trial for calculated damages. And the reason being, as I think Your Honor just intuited, is that the 193 and 407 are just domestic infringement, whereas 083 is international. That's the distinction. Right. But what you were saying, as I understand it, and that was the question I opened with, is that there were several iterations before the Kynar was added that are part of the overall calculation, right? Exactly. Exactly. And not only that, I mean, and this goes to the subject of the Kynar, and just to be clear, I mean, it was added, you know, after claim construction as essentially the exact kind of manipulation that the doctrinal equivalence is designed to prevent, which was created in law offices, not in a laboratory, and it was designed precisely for what they called the, quote-unquote, intellectual property reasons. And it was an attempt to exploit the limits of language. And I think FASTO and all the cases are clear that you look at the substance of what the distinction was. So, you know, first going to the FASTO. Let me, can I, I need to interrupt you, because as long as you're on my housekeeping stuff, what about the injunction, though, as it relates to these paths? So say we were to affirm on OA-3 but not on the other two, just hypothetically. OA-3 is expired, right? No. No. Oh, okay. I thought it had. No. If OA-3 is affirmed, then everything gets affirmed. Okay. Period. That's one thing that's easy about this, is if OA-3 is affirmed, which we believe it should be, then everything gets affirmed, you know, after the arguments about damages and injunction and that kind of thing. You know, and on the injunction, I mean, they have now been selling their replacement product for, you know, close to a year. So that's a whole other thing. With respect to the factual question, you know, the CFO of 10X was questioned by me at trial, and he was explicit that he couldn't identify any technological benefit or any technological reason for adding the Kynar. So counsel's saying that somehow the record supports some improvement, you know, is really hand-waving. The chairman of the board, John Stupnick, was the one that devised this as a venture capitalist, not a droplet scientist. And so I think just factually I just want to correct that. There's no doubt that this was added for intellectual property reasons to try to work around it. They used the invention of the OA-3 patent. I think we can be sure of that on the substance, and this is an attempt to get around. Now let me directly address the legal argument. Yeah, so the real question is, is it a brilliant attempt to get around? Well put, your Honor. And with respect, but just as long as we're clear, that's what's going on here. You know, with respect first to the prosecution history, you know, Judge Andrews lived this case probably more than he liked, and he dug into the prosecution history. This issue came up multiple times. Right, but just to be clear, I mean, the relevant prosecution history is two pages, and it's a legal question. So no matter how many times anybody addressed it, we have to decide it afresh, and there's a tiny bit of material that's relevant to it, right? The only way I, you know, this goes to the whole appellate versus district court in the sense that Quake was the primary reference that at one time was being asserted and no longer is as invalidating, and that's what was in the failed IPRs. And so the judge knew Quake, the Quake reference in and out as to what was being distinguished in terms of the Teflon coating on the inside of the channel wall. So you are right in terms of the extent of the prosecution history, but I just don't think it would be fair to Judge Andrews to suggest that having heard debates about Quake. No, no, but I guess my only point is no matter how many times the district court addressed the question, we have to address the question, and the standard is de novo review. So why is the argument about, and you have the burden on tangentiality, which is the one I guess I want to focus on. How have you established that putting in the word non-fluorinated is tangential to the purpose, I'm sorry, that it is tangential, the purpose of putting that in is tangential to that which makes the Kynar products not literally infringing? Understood. And the punchline was going to be with Judge Andrews. I thought he put it better than I could, which is that putting a de minimis amount of fluorine that has no effect is tangential to distinguishing a microchannel that's coated with Teflon specifically to give it fluorinated properties. And to give something no fluorinated property is tangential to giving it fluorinated properties. To do something for intellectual property reasons that's a word game is different from a technological distinction. Can I ask you this question? This confused me a little bit. When I looked at the evidence of, was it Dr. Shia and the others, I thought there were two possible interpretations of what was being said. One was that the amount of the fluorine put in there simply had no, made no change in the relevant functional property of trying to avoid adherence of that which you did not want to adhere. And the other was, other possible interpretation, is that the tiny amount of the fluorine was having no relevant interactive properties with the fluid that was flowing by. And those seem to me fairly different things. Which is it that you think the evidence establishes? Your Honor, I guess I'm just not sure I totally get the exact difference, but I think it had no effect. It might have been possible that a gigantic amount of fluorine would have left the non-adherence property still in place. And at that point, I don't think there would be any question of tangentiality. So I'm trying to figure out if the minimal percentage of the fluorine just had no interactive effects or whether you're talking about a purely functional, this doesn't make any difference. Both. I mean, it's de minimis. And that's again where I would go back to Judge Andrews. He stated that it was de minimis, which I think is unquestionable on this record. And it's de minimis because it has no effect whatsoever in the system, technologically. I mean, I can say that in absolute terms based on Professor Sia's testimony and the absence of any response. I mean, their expert did say zip about what role it had or its relationship to the quake distinction. So it's completely tangential to add something that has no effect technologically whatsoever relative to a distinction of something that actually coats the wall with fluorine in order to precisely have an effect of creating an all-fluorinated chemistry. And that's what the distinction was about. Your Honor is right. It's two pages. It's 1640, 1641. And that's clear. So in terms of what was disclaimed, right? I mean, the whole point, let's not lose sight. I mean, the whole point of Festo and the tangential relations is to figure out what was disclaimed. And what they were disclaiming was a system that didn't have the wisdom to avoid fluorinated characteristics in the walls. And so having, you know, absolutely de minimis. I mean, that's the whole point of doctrine. It just seems to me it would be unfair and distortion of the doctrine in order to say. What case, Mr. Reines, do you think is the best for you? I mean, I think each one's on its factual own. But, I mean, you know, they gave the example of in situ form. I mean, I thought Festo was saying, you know, the Festo case itself in its articulation of the rule of saying technologically relevant, not directly relevant is the language in Festo. It's 344S31369. But the in situ form, the argument that was the real argument that's being made is we could have used functional language rather than just saying non-fluorinated and assuming that someone would have. I mean, who foresees or anticipates that someone's going to come in and add an amount of the chemistry to change their system in the middle of the product being on the market that doesn't have any effect? I mean, who's going to anticipate that? And so in the sense of in situ form, they didn't have to change it from multiple cups to one cup, but they did. And that's not a gotcha. And here, I think the real point that I'd leave this topic on is you can tell from the prosecution history what was being attempted. There's no ambiguity. They were trying to distinguish a truly fluorinated wall that had the properties associated with fluorine. And that's not what the walls that have with the 0.02% kind are, undisputedly. A de minimis amount neither vitiates the requirement nor is it directly related to distinguishing the quake walls which are dripping with Teflon. Can I ask you this, Mr. Ryan? Is the following different from or in substance or just a different formulation of what you're saying? Might what you're saying be characterized as saying the argument from the other side that non-fluorinated or fluorinated is binary is just wrong. As a claim construction matter, it was given a extremely almost binary claim construction. But the term for purposes of deciding the purpose of the amendment could be either simply about the presence of fluorine atoms or it could also be about fluorine-caused properties. Perfectly put. Perfectly put. I mean, you know, if you could work around language that someone has to choose for claims like this, you know, it just, it would be impossible, you know, especially once the products on the market and the claim construction order is issued. I mean, this is an attempt to exploit the claim construction issues, use, you know, words like contaminant. And then they say, well, we did it intentionally so it's not contamination. I mean, that's just a manipulation of the litigation process, Your Honor. So, unless there's more questions. You know, let me just say briefly, you know, on a literal infringement, you know, I think the only reason the jury went with them is they had this argument based on the term contamination that there was an intent requirement. I mean, it's explicit. We documented the brief that they didn't have, that they intentionally included it and a contamination is something unwanted, therefore it's not literal. I don't think there's any sustainable claim construction that permits that. So, I just, you know, whether you're looking to, you know, I think the DOE is firmly, strongly supportive, as I've just said, but I think literal is as well, conscious no matter how you dice it. This can't, shouldn't be permitted and certainly shouldn't be permitted to overturn a big expensive trial where it's only just a part of the sale for a couple of years. Can I shift you, if my colleagues are willing, to the damages discussion and that the two issues, just for what it's worth to make sure to address them, that I guess I'm particularly interested in hearing about. One is the argument that the district court eventually concluded that the Aclara Bio-Rad license was really not a sound basis for analysis and I think the argument on the other side is given that conclusion, assuming admissibility has been preserved, it was your obligation to show that it could not reasonably have affected the jury's determination. You haven't made that showing, so a new trial is needed. And then the second point I guess I'd like you to address is the, what might be called the conclusory character of the apportionment testimony of, was it Mr. Malachowski, and in that regard I'd like to just ask you to address whether the testimony of Eric Ginsberg, who I guess is the USC licensing guy, about just how much work still needed to be done in order to move from, what is it, the early 2000s when this patent was submitted to see if there was ever going to be a worthwhile marketable product. Why doesn't that point rather strongly in the direction of the percentage being rather lower than it is? Thank you. Please continue. Thank you. So, you know, there was a few questions there. You know, first of all, admissibility was not preserved. It's just not in their opening brief. The word Daubert doesn't come in there with quality of counsel on the other side. They would have used the word Daubert if they meant to reconsider that question. I think Judge Newman nailed it on the nose. This is a standard substantial evidence test on page 64, I believe it is, of the opening brief. That's what they say. They say what the basis was and that the jury verdict isn't supported, and so I don't think they have an evidentiary argument. The Summit 6 case had an issue where there was two licenses that supported the royalty rate, and one went down, and the court said, you know, that there was substantial evidence in the record. So I believe that applies. What I would say is if you look at the big picture, I think when you get down to sort of these, you know, real specific legal arguments, sometimes you need to pull the lens back, which is their product is too soft. Can I just ask you, if I look at page 56, for example, of the blue brief, the verdict should be vacated for that reason alone. It should also be vacated whether on sufficiency or admissibility grounds because, et cetera. I mean, that's in the blue brief. It uses the word admissibility, and it seemed to me to be saying the analysis is the same, so we don't need to keep repeating both words. I think that would be very charitable. I mean, a word search does show that. I just don't think it's a developed argument. They didn't cite to the – I mean, they didn't evaluate. Again, it's 54. The opening paragraph of the section that damages award should be vacated. The award should be vacated as based on evidence that was both inadmissible and insufficient. I mean, maybe they didn't preserve it in some other way, but unless you're saying that the substantive analysis is different between admissibility and insufficiency, and I don't quite see that you've made that argument, it seems to me they're making both points. Yeah. No, I do think it's a different standard because you can have multiple, for precisely this reason that there's three licenses, so another one can be substantial evidence, and so just the failure of an evidentiary argument doesn't suffice. And then I just don't think they looked at the record in his opinion. I mean, you'd have to look at the judge's opinion in Daubert, which there was multiple of, and I just don't think that was analyzed. But let me move on. Okay. That's the way you develop an argument, and it wasn't developed, but people might view that differently. Getting to the court-specific points, the Summit 6 case, I think, you don't have prejudicial error just because there's one piece of one of the licenses. But the bigger point is we had three licenses for basic nucleic acid platforms that had a 15% royalty, and their proposal was 1% on the other hand, and we had three experts testify all about this, Tumelo, Tia, and Malachowski. And so I don't think, like, isolating one and just not looking at the overall picture of what they testified to is fair at all. Specific to the EPLERA-1, and I'll be quick, on the EPLERA-1, that is a real-time PCR system, which is a platform for analyzing nucleic acids. It's for manipulating nucleic acids, and it involves the measurement function as Ms. Tumelo stated. That is sufficiently similar to the platform of a droplet platform. At this point, they can't deny that they're using a droplet platform and that's where their reactions occur, in droplets. That's the whole basis for their platform. Moving to the Ginsburg testimony, you know, I object to that as being considered now as an argument. It wasn't raised at trial. It wasn't raised before the district court, when the district court upheld the verdict. It wasn't raised in the appeal briefs. But even so, yes, there's 85 percent contribution from other things. The important point on apportionment, from my perspective, is this isn't a case like a cell phone case, where there was an entire market value argument and there's a big hustle and tussle about the relationship between the invention and the product. Here, the invention is a droplet product. And so, in that light, there is no argument of an entire market value, which totally changes, I think, the apportionment analysis. On the apportionment analysis, Ms. Tumelo went through and she said, for the caliper license, there was a ton of additional work that was done. And 10X was entitled to cross-examine all of these experts that addressed these issues. And you don't see any meaningful cross-examination in any of their briefs on that. And they could have tried to undermine them. You have a time trial. You present multiple experts on the topic. They cover the territory. If they really wanted to nitpick through, I think that's unfair. Now, the argument that was made, not the Ginsburg argument that we're hearing now, but the argument that was made was that it had to be quantitative. And I just think, Your Honors, please pull back the lens to what someone like Bio-Rad has to do in putting a damages case together. The willful infringement of their stuff. They have to go out. There's not a competitor license because competitors don't license vital technology like this to each other every day. And then you have to go and find comparable stuff that involves the same parties, which we somehow miraculously did and showed that there was a consistent pattern. And so then to go down and say, okay, well, you didn't quantitatively show all the different other contributors, nor was there a cross-examination attempt to undermine that, I think is just unrealistic in this world. And we shouldn't let the cell phone cases defeat a half-billion-dollar investment as in this case. Okay. Mr. Reines, as long as we're running over, there is a question which struck me. It wasn't raised by the other side. But in their brief, they say that there is they raised the question of the injunction and the importance of the product, the importance to the community and to the advancement of science. And they say that, therefore, the permanent injunction was improper. Is this something that you agree is before us to consider? Yes, Your Honor. I do think those issues are before the court. I just think that there's this single-cell product where they have a new design that they've introduced, which is the vast majority of virtually all of their products. And they've replaced them, and they have new products for sale. They have an IPO. That's all in the record. And I don't think there's any significant argument where they have to redesign, that there's a public interest because we're permitting sales onto those platforms. So no research is being stopped for that. With respect to the two other products, they didn't think they were significant enough to put a redesign out. And they didn't make any, they didn't parse. They only put a few sentences in their opening brief. That's probably because they were remodeled. And with respect to those two other products, you know, if they didn't care enough to remodel them, even though they were given, you know, advance warning by the district court that asked them what the status of their design redesign was multiple times, then it shouldn't be, you know, something that's borne by Bio-Rad. We've permitted them to sell on any existing platform that already happened to keep scientific research in continuity. And they've got redesigned products for the primary products they care about. Where is the competition exactly at this point between the two? Yeah, it's primarily in what's called single cell. It's primarily in the single cell area. That's what they've redesigned. They've got a product. They did a $300 million IPO a month after the injunction went into place. They have products that they're selling that they're, you know, declaring are great and better and all that. Why should the injunction reach, I guess, the four other products for which Bio-Rad is not a rival? And as I understand it, there's no evidence that Bio-Rad hasn't said, well, we're not offering those now, but we have some meaningful plans to offer them. In the absence of competition, why an injunction? And it's true, or not true, but it may well be that the other side doesn't care about that. But nevertheless, we have a challenge to a five product injunction. Fair question. So let me address it this way. We're really talking about the single cell CNV and the linked reads. They have redesigned products for all the others. So I think one of the answers is because the product's available for the others. And so it's not – there's no – the balance of harms, you know, goes completely towards Bio-Rad because all these products weren't on its product map. Right, but before you get to balance of harms, how do you even get to the irreparable harm to Bio-Rad on products that Bio-Rad is not offering a rival to? Right, because they were all on the product roadmap. So Bio-Rad got completely – the individuals that started 10X left the company to start up 10X and stated that they weren't using droplets and went and did it and took the droplet expertise from Bio-Rad. Bio-Rad fell behind and had a product map. So the district judge is trying to put them back somewhat in the place that they would have been if this willful infringement didn't happen because they would have pursued their product map without this, you know, primary competitor that had all their expertise. It's like a bigger picture issue. But can you do – when you say a bigger picture issue, wouldn't you have needed to have some kind of trade secret claim to support that? No, I just – the point being that they – by infringement, they had a first mover advantage. And that first mover advantage warrants some leveling. But I guess with respect to the CNV and the Linked Reads product, I mean, I understood there's the balance of harms between the parties. Okay, let me just maybe do a better job this way. And with respect to that, there was irreparable harm because all of these products weren't on the product roadmap of Bio-Rad, which was set forth behind. Kennex for those products, you know, doesn't sell much of them at all and didn't redesign them. So as between those parties, they had the opportunity for a year where the judge was saying, have you remodeled? Have you redesigned? What's the status? And they said, yes, we've redesigned. We're good to go in a January deposition of 2019. And so with respect to those, vis-à-vis the parties, that's the situation. Vis-à-vis the public interest, there's not a showing of significant sales. And certainly, I don't think the public interest factor should be so strong that on a product that's a minor product of the infringer where they haven't bothered to redesign when they haven't for the other products, that the public interest overcomes an injunction when the install base is allowed to continue to do what they're doing. So the install base can continue to do what they're doing. It's just new people can't expand the infringement in the realm of droplet-based technology here. And then you get back to if you're going to argue about the party interest, then you go back to the arguments I've already made. Okay. Any more questions for Mr. Reines? No. No? No. Okay. All right. Thank you, Mr. Reines. So, Mr. Rosenkranz, have you a full rebuttal? Thank you, Your Honor. There was a lot to respond to in a very long presentation. Let me just start with one housekeeping matter. Mr. Reines keeps saying that if the 083 is affirmed, everything is affirmed. As Judge Taranto correctly points out, Mr. Reines conceded a win on the 083 wiped out international sales. Let me say just a couple of words on DOE. I'll be quick on the doctrine of equivalence. Mr. Reines keeps focusing on who came up with the change and what the intent was. The Supreme Court has declared in Warner-Jenkinson, and I quote, intent plays no role in the application of the doctrine of equivalence. As Judge Taranto pointed out, Bio-Rad put in no proof of how a fluorinated microchannel is tangential to amendment that narrowed any microchannel to only fluorinated microchannels. So when Mr. Reines says who would have thought, I would just add that when the patentee decides to use words of exclusion, of course a person of skill in the art would immediately turn to adding fluorine. And Quake was not just about coding with fluorine. It was specifically covering making a chip that had fluorine as an intrinsic element of the chip. On damages, first let me start with the Aplera point. We said over and over in our opening brief that we are making both an admissibility and a sufficiency point at pages 29, 54, 56, and 58. We're asking the court to grant a new trial without the inadmissible Aplera license, which was necessary to support Bio-Rad's entire theory of a 15% industry-wide rate. We didn't have to do anything more than that because the expert said the same thing at trial and before trial, and the district court's J-MAL opinion kept referring back to its own Delbert opinion to reach its conclusion. Can I ask, Mr. Rosenkranz, and I haven't gone back to look, even if it's in the joint appendix, but the motion, the Delbert motion, the inadmissibility motion that you filed, and I don't know if I'm going to ask this precisely right. I hope you can figure out what I'm trying to get at. Was the motion kind of broken down into this license is inadmissible, this one's inadmissible, this one's inadmissible, or was it a global Mr. Malachowski's testimony is inadmissible because it relies on a number of things, each of which collectively raises a problem? Your Honor, we did the latter. We went license by license, uncomparability, and then we went back through them and made the same argument I'm making to this court today about apportionment. And Mr. Reines asked, what is a patentee supposed to do? This court has said what a patentee is supposed to do. Apportionment has to start with the value of the patent to be licensed, the value of them in the licensed product, and the patented technology, not other technology. Bio-Rad's expert admitted that there were other features of value. It's at page 309. Counsel, let me go back to your point that you said you'd argued this both ways. Now, you said it in passing a few times in your blue brief, but I never see a discussion anywhere where you contend that the district court abused its discretion by even allowing the jury to consider the license. You simply ultimately say it's not enough. I mean, the court did say that it was economically comparable, but at the end of the day, he was convinced that it's not sufficiently technologically comparable. But he put it to the jury, and you never said anywhere in your blue brief that that was an abuse of discretion. Your Honor, we stated the standard of review, which was an abuse of discretion standard of review for admissibility. But you don't argue it that way anywhere in your blue brief. Well, Your Honor, it is an abuse of discretion to admit a license when the license is not comparable. That's what laser dynamic does. This court has never required a defendant in a brief before this court to slavishly break out arguments between Daubert and Deficiency when they are the exact same argument for both because the proof was the same for both. And just back to apportionment, Serum says that there has to be some effort at quantification. Mr. Reiner says asking for quantification is too much. But there was literally no effort at quantification. Now, Lakowski's testimony about the applied bio license is a perfect example. He told the jury, I'm quoting from 30,081, I was able to confirm that the relative ratio would not be greater on the green circle than it was on the blue circle. But we have no idea what the two circles were. Or look at his testimony about the caliper license. His analysis boils down to because the caliper license, quote, focused on a very limited set of technologies, the apportionment within the license was comparable to the hypothetical negotiation. This court set an X mark. You have to do more than that. You have to show the judge your work. You have to show the jury your work. And I'll just note to Judge Toronto's very first question, the Daubert license by license analysis is on page 17,013. If there are no more questions about damages, since Mr. Reines said a whole lot about the injunction, if it's okay, I'd like to say just a couple of words about the injunction. Yes, do wrap up on the injunction. Yes, Your Honor. So these are really important instruments that serve a vitally important function in the scientific community. We cited to the court many pages of testimonials by the scientific community about how important these products are for ongoing research. COVID being one of them, if you look at the most recent docket entries in the district court, these instruments needed to get an exemption from the injunction to do critically important COVID research. Marginal competition on one out of five product lines simply is not enough to justify an injunction. Well, let's limit it to an injunction against this party as opposed to scientific research, because I do think that that debate has gotten somewhat removed from the elaborate precedent that we have about using information in patents. So let's talk about the effect of the injunction on this party, on your client. Well, so two answers. One is I was talking about the effect of the injunction on the public interest, which needs our instruments, the scientific community, which needs those specific instruments. But the existing scientific community is allowed to continue to use the instruments to the extent they were, and you've got design-arounds with respect to any future desire, right? Well, so the people who bought an instrument, the early adopters in a very new technology, sure, they can continue their research. But we put in letters from scientists who were saying there are these amazing discoveries that are being made using this instrument. I need to buy one of these instruments. And that is what that document is. But you have a design-around, do you not? We have a design-around, but not for two of the product lines, one of which is the subject of Dr. Parkden's letter. I'm sorry, the two that you don't have a design-around are which? Are C and B and linked reads. C and B was a very new product that was just beginning to break into the marketplace during trial. I'm sorry, and as to both of those, there's no Bio-Rad offering either already in place or attested to as coming? There is no Bio-Rad offering. There is no other instrument developed by anyone else that does those things. And to the other half of Judge O'Malley's question about harm to the parties, these are our only products, and these were path-breaking products. Bio-Rad has 9,000 products. This is 0.2% of their entire revenue stream. So the relative harm to the parties doesn't even compare from one company to the next. If there are no further questions, we respectfully request that the Court reverse the judgment below. Okay, any more questions from the panel? No. Okay, thank you. Thank you all. Thanks to both sides. The case is taken under submission. And that concludes our telephonic conference for this morning. Thank you. The Honorable Court is adjourned from day to day.